**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| **WYOMING MEDICAL ASSOCIATES, LLC,**<br><br>*Plaintiff*,<br>*v.*<br><br>**ROBERT F. KENNEDY, JR.,** in his official capacity as Secretary of Health and Human Services,<br><br>**DR. MEHMET OZ,** in his official capacity as Administrator of the Centers for Medicare & Medicaid Services,<br><br>**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,**<br><br>**CENTERS FOR MEDICARE & MEDICAID SERVICES,**<br><br>*Defendants.* | **Civil Action No. ____-cv-______** |

**ORIGINAL COMPLAINT**

Plaintiff Wyoming Medical Associates, LLC ("Plaintiff" or "Wyoming Medical Associates") hereby brings this complaint against the United States Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services (the "Secretary"), and Dr. Mehmet Oz, in his official capacity as Administrator of CMS (the "Administrator" and, together with HHS, CMS, and the Secretary, "Defendants" or the "Agency"), alleging as follows:

## I. NATURE OF THE ACTION

1. This case involves the Medicare payment and later denial of medically necessary services involving the use of skin-substitutes for non-healing venous leg ulcers ("VLUs"). VLUs are open wounds on a person's lower extremities which are painful, extremely difficult to treat, and resistant to traditional wound care treatments.

2. For decades, physicians have treated VLUs with human cell and tissue-based products—often referred to as skin substitutes[1]—to cover wounds, and their innate properties stimulate and promote wound healing. And for decades, Medicare has covered skin substitutes as medically necessary for the care of wounds that have failed standard treatment under Part B, *see* 42 U.S.C. § 1395 *et seq.*, recognizing that these skin substitutes promote healing and can stave off infection, amputation, and even death; indeed, Medicare has categorized this exact class of treatment as reasonable and necessary medical care. *See Medicare Part B Payments for Skin Substitutes*, U.S. DEP'T OF HEALTH & HUMAN SERVICES, Office of Inspector General, Project Number: OAS-25-09-005 (Nov. 15, 2024) ("Skin substitutes help aid in wound healing and redevelopment of skin. Medicare covers skin substitutes that are reasonable and necessary for the treatment of an enrollee's condition.").

3. This case challenges an unlawful policy implemented by CMS and its agents—Medicare Administrative Contractors ("MACs"), Qualified Independent Contractors ("QICs"), and the Medicare Appeals Council—to retroactively deny Medicare reimbursement payments previously made to healthcare providers for skin substitute products used in the treatment of chronic wounds (the "Retroactive Denial Policy"). Through this Retroactive Denial Policy, CMS

[1] Nicole M. Vecin, et al., *Skin substitutes as treatment for chronic wounds: current and future directions*, FRONTIERS IN MEDICINE (August 29, 2023).

and its agents have retroactively labeled skin substitute products as "experimental" and "investigational," and therefore not "reasonable and necessary" under Medicare, despite the fact that these products have been covered by Medicare for over a decade under existing Medicare reimbursement principles.

4. CMS implemented the Retroactive Denial Policy without notice-and-comment rulemaking, without any formal or informal adjudication, and in direct contravention of the governing Medicare statutes, the Administrative Procedure Act ("APA"), and sub-regulatory guidance. The Retroactive Denial Policy has caused, and continues to cause, significant financial harm to healthcare providers across the country, including Plaintiff, who relied in good faith on existing Medicare coverage policies when furnishing services involving skin substitutes with their patients.

5. This civil action arises from an administrative appeal challenging the Secretary's decision to deny Medicare coverage for skin substitute Xwrap and hold Wyoming Medical Associates liable for the denied charges, well over the requisite threshold of $1,960. Wyoming Medical Associates alleges the following in support of its claims and request for relief.

## II. PARTIES

6. Plaintiff Wyoming Medical Associates, LLC, located in Gillette, Wyoming, is a multispecialty practice that provides wound care services. Plaintiff is enrolled in the Medicare program (NPI: 1114531118) and furnishes healthcare services to Medicare beneficiaries, including patients who have been diagnosed with chronic, non-healing wounds. Plaintiff has used Xwrap, a skin substitute derived from dehydrated amniotic membrane, to successfully treat patients.

7. Defendant Department of Health & Human Services is an executive department in the United States government headquartered at 200 Independence Avenue SW, Washington, DC 20201.

8. Defendant Centers for Medicare & Medicaid Services is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program and is located at 7500 Security Boulevard, Baltimore, Maryland 21244. CMS administers the Medicare program by contracting with private entities such as MACs, Recovery Audit Contractors ("RACs") and Unified Program Integrity Contractors ("UPICs") whose duties are described herein. In addition to MACs, RACs and UPICs, CMS also contracts with an entity known as the Administrative QIC ("AdQIC"), which is responsible for monitoring the application of Medicare payment and coverage policies in individual cases as they make their way through the Medicare administrative review process. The MACs, RACs, UPICs and AdQIC have initiated and are pursuing the illegal Retroactive Denial Policy. They are agents of CMS, and CMS ultimately controls their actions.

9. Defendant Robert F. Kennedy, Jr., sued in his official capacity only, is the Secretary of Health and Human Services. The Secretary has ultimate responsibility for the administration of the Medicare program. His official address is 200 Independence Avenue SW, Washington, DC 20201.

10. Defendant Dr. Mehmet Oz, sued in his official capacity only, is the Administrator of CMS. The Administrator is responsible for administering the Medicare program. His official address is 7500 Security Boulevard, Baltimore, Maryland 21244.

## III. JURISDICTION AND VENUE

11. This Court has jurisdiction under 42 U.S.C. §§ 1395ff(b)(1)(A) and 405(g), which empowers federal courts to exercise subject-matter jurisdiction over a challenge to a final

payment determination under Medicare. In addition, this Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under and involves the interpretation and application of the laws of the United States, including the Medicare statute and the Administrative Procedure Act.

12. As required by 42 U.S.C. §§ 1395ff(b)(1)(A) and 405(g), Plaintiff has fully presented to the Secretary its claims challenging the Retroactive Denial Policy. Plaintiff Wyoming Medical Associates initially received a favorable ALJ decision that was subsequently reversed by the Medicare Appeals Council after the Council took up the appeal on its own motion.

13. Plaintiff Wyoming Medical Associates has received a final, unfavorable decision from the Medicare Appeals Council and has thus fully exhausted its administrative remedies under 42 C.F.R. § 405.1132(a)(1). Wyoming Medical Associates timely pursued judicial review of the Secretary's final decision through litigation filed in the United States District Court for the Northern District of Texas, *McGee et al. v. Kennedy*, Civil Action No. 4:26-cv-00243-O. The action remained pending until August 26, 2026, when that court dismissed Wyoming Medical's claims solely on venue grounds and expressly held that Wyoming Medical Associates, LLC belongs in the District of Wyoming. The court did not disturb Wyoming Medical's exhaustion of administrative remedies or reach the merits of its claims. *See* Exhibit 1 (Order of Dismissal dated August 26, 2026).

14. The amount in controversy exceeds the required threshold of $1,960. *See* 42 U.S.C. § 1395ff(b)(1)(E); 42 C.F.R. § 405.1006(c); 90 Fed. Reg. 55869, 55870–71 (Dec. 4, 2025).

15. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Plaintiff is located and conducts business in this judicial district.

## IV. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Medicare Program and Longstanding Coverage of Skin Substitutes

16. Congress established Medicare as the primary federal health insurance program serving elderly and disabled individuals.

17. The Secretary administers the Medicare program directly and delegates its day-to-day implementation and oversight to CMS. 42 U.S.C. § 1395kk.

18. Medicare Part A covers inpatient hospital services, home health services and hospice services. Medicare Part B, which is relevant to the claims in this civil action, covers physician services that are not provided in an inpatient setting. 42 U.S.C. § 1395 *et seq*. Physician services include items, supplies, and physician-administered drugs that are provided as part of a physician visit or procedure.

19. Consistent with that framework, Medicare Part B has for many years reimbursed physicians and other qualified providers for skin substitutes they use to treat chronic, non-healing wounds including wounds of the lower extremities such as VLUs.

20. Skin substitutes are biologic covers for refractory wounds that generally involve the creation of immunologically inert biological products (containing protein, hormones, or enzymes seeded into a matrix), which may stimulate or facilitate healing or promote epithelialization. These products are administered in a variety of clinical environments, from outpatient hospital settings and physician offices to skilled nursing facilities and in the patient's home setting. Both physicians and patients have come to rely upon their availability to treat chronic wounds. CMS's recognition of the efficacy of these products and the important clinical benefits they provide has supported this longstanding coverage.

**B. Medicare Administrative Contractors**

21. The Medicare statute empowers the Secretary to contract with MACs to carry out the day-to-day administration of the Medicare program. Absent a controlling National Coverage Determination ("NCD") or Local Coverage Determination ("LCD"), a MAC must make claim-by-claim determinations of whether an item or service qualifies as "reasonable and necessary," and therefore covered, under 42 U.S.C. § 1395y(a)(1)(A).

22. In certain jurisdictions, MACs have codified their coverage of skin substitute products by adopting LCDs, which constitute written coverage policies establishing that a particular product or service satisfies Medicare's medically reasonable and necessary standard. 42 U.S.C. § 1395ff(f)(2). Three MACs, specifically CGS Administrators, LLC, First Coast Service Options, Inc., and Novitas Solutions, Inc., implemented LCDs that expressly authorized coverage of skin substitute products for the treatment of chronic, non-healing wounds of the lower extremities.

23. In adopting these LCDs, the MACs evaluated the available clinical evidence and determined that skin substitutes demonstrated superior wound-healing outcomes compared to conventional wound care alone. *See* LCD L36690, Wound Application of Cellular and/or Tissue Based Products (CTPs), Lower Extremities (2016) (the "CGS 2016 LCD"); LCD L36377, Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities (2015) (the "First Coast 2015 LCD"); LCD L35041, Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds (2015) (the "Novitas 2015 LCD"). The LCDs do not exclude any specific brands of skin substitutes.

24. The acceptance of skin substitutes as a covered treatment has extended well beyond those jurisdictions with formal LCDs. MACs that had not published a dedicated LCD nonetheless

approved claims for skin substitute treatments on a routine basis, indicating that coverage was not contingent upon the existence of a written coverage determination but instead reflected a broad, nationwide recognition of the medical appropriateness of these products for treating chronic, non-healing wounds.

25. Absent an LCD or NCD, the MAC's responsibilities include making initial determinations on a case-by-case basis as to whether to pay for services provided to Medicare beneficiaries, i.e., whether to "cover" those services, when claims are submitted for reimbursement. Dictated by the Medicare statute, the MAC, including Noridian Healthcare Solutions ("Noridian"), Plaintiff's MAC in this case, would approve payment for items and services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

26. CMS has interpreted this "reasonable and necessary" standard to mean the item or service is medically appropriate (including its duration and frequency), safe and effective, and not experimental or investigational.[2] For the MAC to consider coverage and payment for any item or service, the information submitted by the provider must corroborate the documentation in the beneficiaries' medical record and confirm that Medicare coverage criteria have been met.[3]

27. In reliance on this longstanding pattern of coverage, Plaintiff has applied skin substitute products, including Xwrap, to Medicare beneficiaries suffering from chronic, non-healing wounds. Medicare has historically and reliably reimbursed these treatments based on its recognition that such products facilitate wound healing. Plaintiff's continued use of these products was grounded in a reasonable expectation, supported by years of consistent reimbursement, that

[2] *See, e.g.*, Medicare Program Integrity Manual ("MPIM") § 3.6.2.2 (last revised Aug. 9, 2024), https://tinyurl.com/yxtnf78e.

[3] MPIM § 3.3.2.1, https://tinyurl.com/yxtnf78e.

Medicare would maintain coverage for eligible beneficiaries receiving these medically appropriate treatments.

28. Plaintiff had no reason to anticipate that Medicare would change course and deny reimbursement for these products. At no point did Plaintiff receive written or verbal notification that skin substitute products would cease to be covered. In fact, claims for these products were routinely approved. Neither CMS nor any MAC issued a general notice to the medical community indicating that payment for skin substitutes would be denied, no utilization review committee communicated that these products would lose coverage, and Plaintiff had no reason to advise any beneficiary of a risk of non-payment because no such risk was apparent.

### C. The Medicare Program Integrity Manual and the Reasonable and Necessary Standard

29. CMS issues sub-regulatory guidance to MACs and adjudicators, including the Medicare Program Integrity Manual ("MPIM"), CMS Pub. 100-08, which sets forth a framework for determining whether an item or service is "reasonable and necessary" under 42 U.S.C. § 1395y(a)(1)(A) in the absence of a controlling NCD, LCD, or other coverage policy. MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1–3.6.2.2. Under this framework, an item or service is reasonable and necessary if it is safe and effective, not experimental or investigational, and appropriate, in accordance with accepted standards of medical practice. *Id*.

30. The MPIM is sub-regulatory guidance, not a binding regulation. ALJs and the Council are not strictly bound by the MPIM, but Medicare regulations direct that adjudicators afford MPIM guidance substantial deference "if they are applicable to a particular case."

### D. The Medicare Appeals Process

31. Congress established a four-tiered administrative appeals process for disputes arising from Part B claims. 42 U.S.C. § 1395ff(a)–(d); *see* 42 C.F.R. § 405.904.

32. Level 1: When a MAC makes an "initial determination" on a Part B claim, a dissatisfied party may request that the contractor perform a "redetermination." 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. § 405.904(a)(2).

33. Level 2: A party dissatisfied with the redetermination may then seek "reconsideration" by a Qualified Independent Contractor, which conducts an independent review of the claim. 42 U.S.C. § 1395ff(c); 42 C.F.R. §§ 405.960, 405.974(a).

34. Level 3: Following an unfavorable reconsideration, a party may request a hearing before an ALJ at the Office of Medicare Hearings and Appeals ("OMHA"). 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. § 405.936(a). The ALJ is not bound by findings from lower levels and conducts a *de novo* review of the claims on appeal and fully examines the issues, questions witnesses, and accepts material evidence. 42 C.F.R. § 405.1030(b).

35. Level 4: If a party is dissatisfied with the ALJ's decision, or if the Medicare Appeals Council (the "Council") elects to act on its own motion, the Council may review the ALJ's decision *de novo* and may adopt, modify, or reverse the decision. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. §§ 405.1100(a), (c), 405.1108(a), 405.1110, 405.1128(a)–(b). The Council's decision is final and binding on all parties unless a federal district court issues a decision modifying it. 42 C.F.R. § 405.1130.

36. Level 5: A party dissatisfied with the Council's final decision may file an action for judicial review in federal district court. 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1130, 405.1136.

### E. Venous Leg Ulcers Are Commonly Treated with Skin Substitutes Medicare Administrative Contractors

37. VLUs are open, chronic wounds of the lower extremity that develop because of chronic venous insufficiency ("CVI"), a condition in which failing veins cause blood to flow

backward and pool in the lower leg. The resulting increase in venous pressure (known as venous hypertension) damages the surrounding tissue, impairs oxygen delivery to cells, and ultimately causes the skin to break down into an open wound.

38. VLUs are among the most common chronic wounds encountered in clinical practice. Multiple MACs across various jurisdictions have recognized that over 90% of chronic lower extremity ulcers are related to venous stasis disease and diabetic neuropathy. It is estimated that approximately 1.5 million patients in the United States develop venous leg ulcers, and the total direct medical costs from venous ulcer treatment in the United States have been estimated to exceed $20 billion annually.

39. VLUs are notoriously resistant to standard wound-care measures. Because the underlying CVI continuously impairs venous return and increases pressure in the lower leg, the wound bed remains poorly oxygenated and prone to stalling in the inflammatory phase, even when the clinician implements traditional therapies, including infection and edema control, mechanical offloading, compression, debridement, and management of inciting medical issues.

40. VLUs frequently meet the rubric for chronic, non-healing wounds, as they are characterized by chronicity, slow healing, and high recurrence rates. Even after healing, recurrence rates for venous ulcers are known to be as high as 20–40% within the first year, and as high as 60% after five years. The clinical literature submitted in connection with the administrative proceedings below identifies the undesirable variation in wound care practice and the large number of wound dressings and wound care products available as additional complicating factors. They are painful, they generate a strong and unpleasant odor, and they cause decreased mobility, all of

which can lead to social isolation.[4]

41. The primary treatment regimen of a venous leg ulcer is conventional care. Skin substitutes are reserved for those cases in which the conventional standard of care fails, and the wound becomes treatment resistant. The conventional standard of care regimen for these wounds includes routine wound assessment and monitoring, infection control, debridement, and the application of conventional dressings that maintain a moist wound environment. Unfortunately, even with standard care and moisture-retaining wound dressings, many venous leg ulcers and diabetic foot ulcers become chronic and do not heal, leading to the need for additional wound therapy to avoid amputations and other serious consequences of unhealed wounds, which may even lead to death.

42. Fortunately, skin substitutes offer much-needed relief, and it has now become standard medical practice to treat chronic venous leg ulcers with skin substitutes. While conventional dressings cover wounds to prevent infection and maintain a moist environment, skin substitutes do that and more. Defendants' own agents published LCDs that acknowledge that skin substitutes are "inert biological products . . . which may provide protein or growth factors proposed *to stimulate or facilitate healing or promotion of epithelization*." Exhibit 2 at 4, CGS 2016 LCD (emphasis added); Exhibit 3 at 7, Novitas 2015 LCD (same). In CGS's and Novitas' words:

> The addition of Skin Substitutes or Cellular or Tissue Based Products (CTPs) to certain wounds may afford a healing advantage over dressings and conservative treatments when these options appear insufficient to affect

---

[4] *See* Nicole M. Vecin & Robert S. Kirsner, *Skin Substitutes as Treatment for Chronic Wounds: Current and Future Directions,* 10 Frontiers in Med. 1, 1 (2023), https://tinyurl.com/y8497x97; Trientje B. Santema, Paul P.C. Poyck, & Dirk T. Ubbink, *Skin Grafting and Tissue Replacement for Treating Foot Ulcers in People with Diabetes*, 2 Cochrane Database Systematic Revs. 1 (2016), https://tinyurl.com/2t98z5kc.

complete healing.

Exhibit 3 at 6, Novitas 2015 LCD; *see* Exhibit 2 at 3, CGS 2016 LCD. It is precisely because of this "healing advantage" that *all* MACs for many years covered skin substitutes prior to developing and applying the illegal Retroactive Denial Policy.

43. Products commonly described as skin substitutes are regulated by the FDA under one of four categories depending on the origin and composition of the product and are listed with a Healthcare Common Procedure Coding System (HCPCS) code in the Q41XX series. *Id.* One such category encompasses Human Cells, Tissues, and Cellular and Tissue-Based Products ("HCT/Ps") regulated under Section 361 of the Public Health Service Act and 21 C.F.R. Part 1271. Several LCDs—including Novitas LCD L35041, First Coast LCD L36377, and CGS LCD L36690—provide that each 361 HCT/P product "may be considered reasonable and necessary" if it has a 361 HCT/P exemption and is being used in accordance with that product's individualized application guidelines.

44. Clinical literature supports the use of amniotic membrane products in this context. Peer-reviewed studies demonstrate that the use of amniotic tissue derivatives in wound care allows wounds to heal more quickly and leads to significantly higher wound closure rates as compared to other products.[5] Recent peer-reviewed literature further confirms that this therapeutic benefit extends across the broader class of amniotic and other HCT/Ps, regardless of the specific brand or

---

[5] *See* Schmiedova I., et al., *Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds*, MEMBRANES *(Basel)* 11(12):941 (2021); Lahmal K., et al., *Systematic review on the rational use of amniotic membrane allografts in diabetic foot ulcer treatment*, BMC SURG. 21(1):87 (2021); *Evaluation of Cellular, Acellular, and Matrix-Like Products (CAMPs) in the Management of Nonhealing Diabetic Foot Ulcers: An Interim Analysis of the STABLECAMP Trial*, 1 Int'l J. Tissue Repair (Oct. 2025); *Evaluation of Cellular, Acellular, and Matrix-Like Products in the Management of Nonhealing Venous Leg Ulcers: An Interim Analysis of STABLECAMP*, 1 Int'l J. Tissue Repair (Oct. 2025) ALJ Dec. No. 3-15400961475, OMHA-152 at 4 (citing both studies).

the wound's location, etiology, or treatment setting,[6] including patients' homes, in addition to private clinics and nursing homes.[7]

45. As noted above, human amniotic tissue products, including Xwrap, fall within the HCT/P category. To be regulated solely under Section 361, rather than subjected to the FDA's more onerous premarket review and approval requirements for drugs, biologics, or devices, an HCT/P must satisfy four criteria set forth at 21 C.F.R. § 1271.10(a), including that the product is minimally manipulated and intended only for "homologous use"—that is, that it performs the same basic function in the recipient as it did in the donor, such as serving as a protective barrier or covering for a wound.

### F. The Secretary's Unlawful Retroactive Denial Policy

46. The Retroactive Denial Policy and resultant denial of Plaintiff's claims for Xwrap did not arise from any deficiency unique to Plaintiff's treatment of the beneficiary in this case. Rather, it reflects a broader, undisclosed policy under which the Secretary's agents, including MACs, QICs, and UPICs, have systematically changed course by denying Medicare claims for skin substitute products that it routinely paid for, including Xwrap, on the ground that such products are suddenly "experimental" or "investigational," notwithstanding years of prior Medicare coverage and payment for the very same products.

47. On information and belief, other Medicare providers who furnished Xwrap and other skin substitute products to their patients have experienced the same sequence of events as Plaintiff: claims that Medicare consistently paid were later denied as purportedly experimental or

---

[6] *See* Daniel Kapp et al., *Efficacy of a Dual-Layer Pre-Hydrated Amniotic Membrane Allograft in the Treatment of Hard-to-Heal Wounds*, 35 J. WOUND CARE 150 (Feb. 2026).

[7] *See* Shaun Carpenter et al., *Efficacy of Cellular and/or Tissue-Based Product Applications on All Non-Pressure Injury Chronic Wound Types in a Medicare Private Practice Model*, 37 WOUNDS 292 (Aug. 2025).

investigational, often based on a product's "Q" billing code rather than on any new clinical evidence and, where an ALJ ruled in the provider's favor, the favorable decision was referred by CMS or the AdQIC to the Council for own-motion review and reversal.

48. Indeed, there are numerous other Medicare providers that use skin substitutes for Medicare beneficiaries suffering from chronic/non-healing wounds who have also filed civil actions against the Secretary and CMS in federal courts throughout the nation for unlawful Medicare denial practices associated with skin substitutes. *See, e.g.*, Compl. ¶ 5, *Koonce*, No. 5:25-cv-00360 (Medicare Appeals Council vacating, on Council's own motion, three favorable ALJ decisions and because the provider "failed to provide authoritative evidence to support a finding that Impax was 'safe and effective, not experimental or investigational, and appropriate for the beneficiary's condition,'" even though the MAC approved seven of ten treatments for the beneficiary at issue); Compl. ¶ 1 & Ex. A at 14, *Riegelhaupt*, No. 1:24-cv-07606 (Medicare Appeals Council, on its own motion, reversing favorable ALJ decision because it was "ultimately unable to ascertain whether . . . EpiFix, PuraPly AM, and DermACELL products are safe and effective, and not experimental or investigational.").

49. The Retroactive Denial Policy departs, without explanation, from the Secretary's longstanding practice of covering skin substitute products, including HCT/Ps such as Xwrap. Under this new approach, the Secretary's agents label a skin substitute product as "investigational" or "experimental" unless the provider can produce voluminous peer-reviewed literature demonstrating that specific product's effectiveness. This requirement is unprecedented. Neither the FDA nor CMS has ever required providers to compile product-specific clinical studies as a condition of coverage during the many years in which skin substitute claims were routinely paid;

no statute, regulation, NCD or LCD establishes such a requirement, and its sudden imposition has left wound care providers without fair warning.

50. The Secretary and his agents have not identified any new clinical evidence, changed medical consensus, or amended any NCD, LCD, or other coverage policy that would justify reclassifying skin substitute products that were previously covered as "experimental" or "investigational." Nor have the Secretary and his agents provided notice and an opportunity for public comment before adopting and applying this changed coverage standard, even though such notice and comment is required for changes that affect substantive Medicare payment standards.

### G. CMS's Failed Attempts to Formalize the Retroactive Denial Policy Through LCDs Medicare Administrative Contractors

51. Indeed, the Secretary's own contractors attempted more than twice to accomplish through proposed LCD changes what the Retroactive Denial Policy now accomplishes without any such note-and-comment process: a sweeping narrowing of coverage for skin substitute products based on the same "experimental" or "investigational" rationale. Multiple attempts, in 2022-2023 and again in 2024, failed and were withdrawn before ever taking effect, arguably because they lacked adequate justification and did not follow the required procedures. *See* Exhibit 4 (CMS notice regarding updates to final 2026 LCDs) and Exhibit 5 (CMS withdrawal notice regarding final 2026 LCDs). The Secretary even updated the Medicare Part B payment methodology for skin substitutes effective January 1, 2026 in CMS's CY 2026 Physician Fee Schedule without limiting the brand of skin substitute products that would be covered.

52. The Secretary cannot lawfully achieve retroactively, through an undisclosed Retroactive Denial Policy, the same substantive result that his own contractors were unable to achieve prospectively through attempted LCDs. The repeated failure to adopt these LCDs through

the proper notice-and-comment process underscores that CMS has been enforcing the Retroactive Denial Policy without lawful authority and in circumvention of the required rulemaking process.

53. The Retroactive Denial Policy, and its application to deny Plaintiff's claims for the Xwrap treatments furnished to Beneficiary J.W. is arbitrary, capricious, and contrary to law for the reasons alleged herein.

### H. Plaintiff's Services Provided to Beneficiary J.W. Involved Xwrap Medicare Administrative Contractors

54. Wyoming Medical Associates, LLC is a multispecialty practice located in Gillette, Wyoming, that treats Medicare beneficiaries, including patients who suffer from chronic wounds in the form of venous leg ulcers and diabetic foot ulcers that do not respond to conventional treatment methods. Consistent with Medicare's policy of covering and reimbursing for the use of skin substitutes, Wyoming Medical Associates has provided wound care services to many Medicare beneficiaries over the years.

55. Wyoming Medical Associates used Xwrap wound covers (HCPCS code Q4204), a skin substitute product derived from dehydrated amniotic membrane, to treat Medicare beneficiaries suffering from chronic, non-healing wounds. Xwrap is a human placental allograft tissue that has received FDA clearance as a designated Section 361 HCT/P product when intended to be used as a barrier, wrap, or cover.

56. In the appeal at issue here (OMHA Appeal No. 3-15371266459), Wyoming Medical Associates furnished Xwrap to beneficiary J.W. on April 18, April 26, and April 30, 2024, to treat venous stasis ulcers located on his lower extremities. J.W. first noticed new ulcers on his legs in December 2023 and began undergoing wound care in January 2024. Despite a number of conservative measures—including edema management, dietary control with increased protein intake, alcohol cessation, elevating legs daily, bilateral thigh-length compression

stockings, debridement with gauze, sharp debridement, Anasept, collagen fibers, and compression boots—J.W.'s wounds were not healing. Wyoming Medical Associates determined, based on its practitioners' medical judgment and experience, that J.W.'s comorbidities and need for wound healing prior to hip surgery necessitated the use of more advanced treatment, including the application of Xwrap. Wyoming Medical Associates applied 32 units of Xwrap on April 18, 16 units on April 26, and 16 units on April 30, 2024.

**I. Administrative Procedural History Medicare Administrative Contractors**

57. Wyoming Medical Associates billed Medicare for the Xwrap treatments described above. CMS initially covered all of the treatments without issue.

58. However, as part of a pre-payment review, Noridian, the MAC with jurisdiction over these claims, issued Remittance Advices dated August 15, August 19, and September 5, 2024, informing Wyoming Medical Associates that the claims were being denied. Wyoming Medical Associates timely submitted Requests for Redetermination. Noridian subsequently issued unfavorable redetermination decisions dated December 4, December 5, and December 19, 2024. Noridian's Medical Directors deemed the services to be investigational "due to insufficient data to support benefit to a pressure sore from the application of a skin substitute" and therefore did not meet the requirements for coverage. Exhibit 6 (collection of Noridian redetermination decisions).

59. On May 30, 2025, Wyoming Medical Associates timely filed a Request for Reconsideration with the Medicare Part B North Qualified Independent Contractor, C2C Innovative Solutions, Inc. ("C2C" or the "QIC"). C2C issued unfavorable reconsideration decisions dated July 22, 2025. The QIC determined that the "Q code status" of Xwrap denoted an experimental and investigational item or service and that Xwrap was "not payable per CMS." The QIC erroneously referred to the services at issue as "Impax amniotic membrane (Q4262)" in its

decision, even though the claims involved Xwrap (Q4204). Exhibit 7 (collection of C2C reconsideration decisions).

60. On August 6, 2025, Wyoming Medical Associates timely requested a hearing before an ALJ. The ALJ conducted a consolidated hearing on September 30, 2025. Wyoming Medical Associates presented the testimony of Dr. Charles Zelen, DPM, as an expert witness in amnion trials. Dr. Zelen testified that he is board-certified in foot and ankle surgery, was the first investigator to look at the use of amnion for chronic diabetic wounds, and has over 15 years of managing clinical trials showing the success of amnion. Consistent with long-standing Medicare coverage and reimbursement of skin substitutes, Wyoming Medical Associates argued that there was more than adequate medical evidence to support the use of Xwrap to treat the beneficiary's venous stasis wounds and that amniotic membrane products are "functionally identical" in their wound-healing properties. Noridian submitted a position paper as a non-party participant but did not appear at the hearing.

61. On November 4, 2025, ALJ Kelly McNeil Legier issued a partially favorable decision, finding that the Xwrap provided to the beneficiary met Medicare criteria and was medically reasonable and necessary in accordance with § 1862(a) of the Social Security Act. Exhibit 8 (ALJ decision). The ALJ determined that there was no applicable NCD or LCD in this case and evaluated the claims under the reasonable and necessary standards set forth in the MPIM. The ALJ found, based on the "detailed and highly persuasive" testimony of Dr. Zelen, that amniotic membrane wound covering products are essentially "functionally identical" and that Wyoming Medical had submitted "numerous peer-reviewed evidence-based studies involving amniotic wound covering products" supporting Medicare coverage. The ALJ further found that the beneficiary had tried and failed conservative treatment, his wounds had remained in a

nonhealing state for more than 31 days, and the beneficiary's comorbidities and need for wound healing prior to hip surgery "necessitated the use of more advanced treatment including skin substitutes." *Id.* at 13.

62. Despite this favorable decision, on December 29, 2025, CMS filed a memorandum with the Medicare Appeals Council asking the Council to review the ALJ's decision on its own motion pursuant to 42 C.F.R. § 405.1110. On March 9, 2026, the Medicare Appeals Council reversed the ALJ's decision. Exhibit 9 (Appeals Council decision). The Council found that the ALJ "materially erred as a matter of law by not fully reviewing and applying pertinent CMS guidance for determining medical reasonableness and necessity in the absence of an NCD, LCD, or other guidance." *Id.* at 6. The Council held that the ALJ failed to properly determine under the MPIM provisions whether Xwrap was "safe and effective," "not experimental or investigational," and "appropriate" based on "the available evidence of general acceptance by the medical community." *Id.* at 8 (internal quotation marks omitted).

63. The Council further found that the evidence in the record did not support that Xwrap was medically reasonable and necessary, concluding that Wyoming Medical Associates "has not demonstrated that the Xwrap at issue was medically reasonable and necessary under the applicable manual requirements." The Council reversed the ALJ's decision and found that Medicare Part B does not cover the Xwrap wound covers at issue. *Id.* at 11. The Council also found Wyoming Medical Associates liable for the non-covered costs. *Id.*

64. In reaching its decision that the products in question were "experimental or investigational," the Council applied the same requirements Defendants have broadly applied throughout the administrative process, demanding that Wyoming Medical Associates provide "published original research in peer-reviewed medical journals, systematic reviews and meta-

analyses, evidence-based consensus statements and clinical guidelines" specifically addressing Xwrap—a requirement nowhere found in the operative 2015–2016 LCDs or Medicare's longstanding coverage and reimbursement of skin substitutes. The Council dismissed as insufficient all ten pieces of medical literature Wyoming Medical Associates submitted because none of them "specifically mention Xwrap," *id.* at 10, even though the studies addressed the same class of amniotic wound covering products. The Council further rejected the testimony of Wyoming Medical Associates' expert witness that amniotic wound covering products are "functionally identical," *id.* at 8, despite the ALJ's finding that this testimony was "detailed and highly persuasive," *id.* at 4.

65. Wyoming Medical Associates has fully exhausted its administrative remedies. The Appeals Council's decision constitutes a final decision of the Secretary that by statute is appealable to federal district court.

66. Plaintiff thereafter timely sought judicial review in federal court as a named plaintiff in class action *McGee et al. v. Kennedy*, Civil Action No. 4:26-cv-00243-O, before the United States District Court for the Northern District of Texas. *See* 42 U.S.C. §§ 405(g), 1395ff(b)(1)(A).

67. Throughout the pendency of that action, Defendants had actual notice of Plaintiff's claims, actively litigated those claims, and suffered no prejudice from Plaintiff's pursuit of judicial review.

68. On August 26, 2026, the Northern District of Texas dismissed Wyoming Medical Associates' claims solely on venue grounds. The court expressly held that "Plaintiff Wyoming Medical Associates belongs in the District of Wyoming." *See* Exhibit 1 (Order of Dismissal dated August 26, 2026). The court did not dismiss Plaintiff's claims on the merits.

69. Plaintiff promptly filed this action in the forum identified by the Northern District of Texas as the proper venue.

## V. CLAIMS FOR RELIEF

### COUNT I
### Violations of the Administrative Procedure Act

70. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

71. Under the Administrative Procedure Act, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it reverses course without a reasoned explanation, when it treats similar cases differently without explanation, or when it fails to consider evidence contrary to its conclusion.

72. The Council's decision is arbitrary and capricious because it treated the MPIM—sub-regulatory guidance that, by its own terms, governs MACs, CERT, Recovery Auditors, and UPICs, and that 42 C.F.R. § 405.1062(a) subjects to "substantial deference" rather than mandatory compliance—as a binding legal command the ALJ was required to follow, without any reasoned basis for that departure from the regulation's plain terms.

73. The Council's decision is also arbitrary and capricious because it declared the record devoid of medical literature supporting Xwrap while disregarding, without reasoned explanation, the clinical studies that the ALJ expressly referenced and relied upon in reaching her partially favorable decisions, and because it summarily dismissed the ALJ's analysis of consistent, cross-jurisdictional LCDs covering the same product class without engaging with their substance.

74. The Council's decision is further arbitrary and capricious because, after conceding that J.W.'s medical records documented his wound and the treating practitioner's judgment that

other treatments were insufficient, it rejected that evidence under a categorical rule—borrowed from LCD-development guidance rather than the individualized coverage standard it purported to apply—without explaining why the evidence failed the "safe and effective" or "appropriate" prongs of that standard.

75. The Council's decision is additionally arbitrary and capricious because it failed to consider the significant reliance interests at stake in reversing four consistent, fully favorable ALJ decisions, including that Medicare had already reviewed and paid Plaintiff's claims for the exact treatments at issue and that Plaintiff furnished those treatments in reliance on the Secretary's longstanding coverage practice for skin substitute products.

76. As a direct result of the Council's unlawful decision, Plaintiff has been denied Medicare payment to which it is entitled and has been found liable for an overpayment.

## COUNT II
## The Retroactive Denial Policy Is an Unlawful, Unpublished Rule in Violation of the APA

77. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

78. The Retroactive Denial Policy constitutes a substantive change to Medicare coverage standards under 42 U.S.C. § 1395y(a)(1)(A) that was required to be promulgated through notice-and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2), for which the Secretary was required, at a minimum, to articulate a reasoned basis and provide fair notice before applying it retroactively to previously covered and paid claims. The Secretary provided no reasoned explanation or notice before applying the Retroactive Denial Policy to deny Plaintiff's claims.

79. The Retroactive Denial Policy is also arbitrary and capricious under 5 U.S.C. § 706(2)(A) because the Secretary and his agents have failed to articulate any reasoned basis for departing from the Secretary's longstanding coverage practice for skin substitute products, have

failed to identify any new clinical evidence or changed medical consensus justifying that departure, and have failed to consider the reliance interests of providers, like Plaintiff, that furnished these products to Medicare beneficiaries based on the Secretary's existing coverage policies.

80. The application of the Retroactive Denial Policy to deny Plaintiff's claims for the Xwrap treatments furnished to J.W. is contrary to 42 U.S.C. § 1395y(a)(1)(A) because it rests on an undisclosed, product-specific literature requirement that was never adopted through rulemaking and has no basis in the statute, the applicable regulations, or any NCD or LCD governing the jurisdiction in which Plaintiff's claims were processed.

81. As a direct result of the Secretary's unlawful application of the Retroactive Denial Policy, Plaintiff has been denied Medicare payment to which it is entitled and has been found liable for an overpayment.

**COUNT III**
**Violation of the Medicare Statute, 42 U.S.C. § 1395y(a)(1)(A)**

82. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

83. Under 42 U.S.C. § 1395y(a)(1)(A), Medicare must pay for items and services that are reasonable and necessary for the diagnosis or treatment of illness or injury, except for services the statute specifically excludes. Plaintiff brings this claim pursuant to 42 U.S.C. § 405(g), which authorizes judicial review of whether the Secretary correctly applied the reasonable-and-necessary standard to the undisputed facts of this case, independent of whether the Council's decision-making process satisfied the arbitrary-and-capricious standard alleged in Count I.

84. Plaintiff treated J.W. with Xwrap, which is reasonable and medically necessary, as evidenced by the underlying administrative record, including the medical literature and ALJ decision covering the Xwrap provided to J.W.

85. The Council's finding that Xwrap was not reasonable and necessary is contrary to 42 U.S.C. § 1395y(a)(1)(A) because the product belongs to a class of items long recognized as safe, effective, and appropriate for the treatment of chronic, non-healing wounds.

86. The Secretary's failure to pay Plaintiff for the Xwrap skin substitute and related application services furnished to the beneficiary is a violation of the Medicare Statute.

**COUNT IV**

**Violation of the Medicare Statute, 42 U.S.C. § 1395pp: Limitation on Liability/Waiver of Recovery**

87. Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

88. Under 42 U.S.C. § 1395pp(a), where Medicare payment for an item or service is disallowed—for example, under 42 U.S.C. § 1395y(a)(1)—but both the beneficiary and the provider or supplier did not know, and could not reasonably have been expected to know, that payment would not be made, payment must nonetheless be made notwithstanding the disallowance, as though the exclusion did not apply.

89. The Council found that Plaintiff knew or should have known that Medicare's coverage requirements were not satisfied, and further found that Plaintiff, rather than the beneficiary, is financially liable for the non-covered costs and not entitled to a waiver of recovery of the resulting overpayment.

90. That finding is contrary to 42 U.S.C. § 1395pp. Neither Plaintiff nor the beneficiary knew, nor could reasonably have been expected to know, that Medicare would not cover treatment.

91. In fact, Medicare itself had already reviewed and paid for various other nearly identical treatments furnished by the Plaintiff before abruptly reversing itself without identifying

any new evidence, any change in governing law, or any development in the medical literature that would justify a different outcome.

92. The Secretary's denying Plaintiff the limitation on liability and waiver of recovery to which it is entitled under 42 U.S.C. § 1395pp is a violation of the Medicare Statute.

## VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiff Wyoming Medical Associates, LLC respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

a. Reinstate the Administrative Law Judge's partially favorable decision dated November 4, 2025, and order the Secretary to process and pay Plaintiff's claims;

b. Declare that Defendants' application of the Retroactive Denial Policy to Plaintiff's claims for services involving skin substitutes is unlawful;

c. Limit Plaintiff's liability under 42 U.S.C. § 1395pp(a), 42 C.F.R. § 411.406, and Medicare Claims Processing Manual § 30.2.1 since there was no way Plaintiff knew or reasonably could have known that the products would not have been covered and no evidence of knowledge by Plaintiff;

d. Award Plaintiff's costs and attorneys' fees as appropriate; and

e. Grant such other and further relief as this Court deems just and proper.

Dated: September 26, 2026

Respectfully submitted,

*/s/ Christopher M. Wages*
Christopher M. Wages
The Wages Group, LLC
Wyoming State Bar No. 6-3276
chris@wagesgroup.com
130 South Main Street
Buffalo, WY 82834
Tel: 307-684-2008
Fax: 307-425-1017

Juliet M. McBride (*pro hac forthcoming*)
Holland & Knight LLP
juliet.mcbride@hklaw.com
811 Main Street, Suite 2500
Houston, Texas 77002
Tel: 713-244-8244
Fax: 713-821-7001

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing has been served through the Court's ECF electronic filing system to the known users of the Court's ECF filing system on September 25, 2026.

*/s/ Christopher M. Wages*
CHRISTOPHER M. WAGES