# Complaint Exhibit 9

**DEPARTMENT OF HEALTH & HUMAN SERVICES** Office of the Secretary

Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC 20201
(202)565-0100/Toll Free:1-866-365-8204

MAR 13 '26 RCVD

Docket Number: M-26-1373
OMHA Appeal Number: 3-15371266459

Jennifer L. Colagiovanni
Wachler & Associates, P.C.
210 E. 3rd St., Suite 204
Royal Oak, MI 48067

NOTICE OF OWN MOTION REVIEW AND
DECISION OF MEDICARE APPEALS COUNCIL

What This Notice Means

The Medicare Appeals Council (Council), under the authority of 42 C.F.R. § 405.1110, has decided, on its own motion, to review the Administrative Law Judge (ALJ)'s action dated November 4, 2025. In the enclosed decision, we explain why.

In deciding to review the action below, the Council has considered the memorandum from the Centers for Medicare & Medicaid Services (CMS) dated December 29, 2025. A copy of the memorandum, with any attachments, was previously provided to you by CMS.

If you have any questions, you may contact the CMS regional office or the local Medicare contractor.

Your Right to Court Review

If you desire court review of the Council's decision and the amount in controversy is $1,960 or more, you may commence a civil action by filing a complaint in the United States District Court for the judicial district in which you reside or have your principal place of business. *See* § 1869(b) of the Social Security Act, 42 U.S.C. § 1395ff(b). The complaint must be filed within sixty days after the date this letter is received. 42 C.F.R. § 405.1130. It will be presumed that this letter is received within five days after the date

shown above unless a reasonable showing to the contrary is made. 42 C.F.R. § 405.1136(c)(2).

If you cannot file your complaint within sixty days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134.

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council's docket number and ALJ appeal number shown at the top of this notice. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201. In addition, you must serve the United States Attorney for the district in which you file your complaint and the Attorney General of the United States. *See* rules 4(c) and (i) of the Federal Rules of Civil Procedure and 45 C.F.R. § 4.1.

This notice and enclosed order were mailed on: March 9, 2026.

Enclosure

cc: Beneficiary
Wyoming Medical Associates, LLC
Q2A AdQIC Records Management

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
**Medicare Appeals Council**
**Docket No. M-26-1373**

Wyoming Medical Associates, LLC, Appellant
OMHA Appeal No. 3-15371266459

## DECISION

The Medicare Appeals Council (Council) has decided on its own motion, to review the Administrative Law Judge (ALJ)'s decision dated November 4, 2025, concerning Medicare Part B coverage of Xwrap wound covers (Xwrap) (billed under Healthcare Common Procedure Coding System (HCPCS) code Q4204) the supplier-appellant (appellant) furnished to the beneficiary on April 18, April 26, and April 30, 2024. The ALJ found that Medicare covers the Xwrap at issue.[1]

By memorandum filed December 29, 2025, the Centers for Medicare & Medicaid Services (CMS) has asked the Council to review the ALJ's decision. 42 C.F.R. § 405.1110. The Council limits its consideration of the ALJ's decision to the specific exceptions raised by CMS. *Id.* § 405.1110(c). We enter the CMS referral memorandum into the record as Exhibit (Exh.) MAC-1. CMS sent a copy of its referral memorandum to the appellant, and the appellant has filed a response, which the Council enters into the record as Exh. MAC-2.

For the reasons set forth below, the Council reverses the ALJ's decision.

---

[1] We note that the appellant had requested reconsideration of services billed under Current Procedural Terminology (CPT) codes 15271 and 15272 for the April 18 and April 26, 2024, dates of services. *See* File 3 at 7. However, the Qualified Independent Contractor dismissed the appellant's request with respect to these services because the appellant had not received a redetermination decision. *See* File 2 at 5–6. As the appellant did not request that the Administrative Law Judge (ALJ) review these dismissals in its request for hearing, those services were not at issue before the ALJ, and by extension the Council. *Compare* File 1 at 9, *with* File 3 at 7; *see also* 42 C.F.R. § 405.1032(a). Moreover, we wish to clarify the dates of service at issue here (Office of Medicare Hearings and Appeals (OMHA) Appeal No. 3-15371266459). While the ALJ listed the dates of service as ranging from "April 18, 2024, to April 30, 2024", we believe it prudent to point out that the April 25, 2024, date of service is not included in the present appeal. *See* File 1 at 2, 9 (noting that the appellant requested a hearing for two separate appeals); *see also id.* at 9 (listing the two Medicare Appeal Numbers at issue and the dates of services included in either appeal). Accordingly, we proceed with our review of the ALJ's decision (OMHA Appeal No. 3-15371266459) which concerned the April 18, April 24, and April 30, 2024, dates of service.

## DISCUSSION

At issue in this case is Medicare coverage of Xwrap the appellant furnished to the beneficiary on April 18, April 26, and April 30, 2024. File 3 at 9, 12, 14. The Xwrap was used to treat the beneficiary's venous stasis wounds on his legs that had remained in a nonhealing state. *Id.* at 44. In its redetermination decisions, the Medicare Administrative Contractor (MAC) denied coverage because the MAC's Medical Directors deemed the services to be investigational "due to insufficient data to support benefit to a pressure sore from the application of a skin substitute" and therefore did not meet the requirements for coverage.[2] *See id.* at 20–21, 29–30, 37. This denial of coverage was affirmed by the Qualified Independent Contractor (QIC) in its reconsideration decision, where it determined that the "Q code status" denoted an experimental and investigational item or service. File 2 at 5. The QIC further found that the "Impax amniotic membrane [(HCPCS code] Q4262] . . . is not payable per CMS." File 2 at 5.[3]

Following a hearing, the ALJ issued a partially favorable decision. The ALJ found that the Xwrap at issue provided to the beneficiary met Medicare criteria and was medically reasonable and necessary in accordance with § 1862(a) of the Social Security Act (Act). *See* Decision (Dec.) at 5–7. The ALJ determined that there was no applicable National Coverage Determination (NCD) or Local Coverage Determination (LCD) in this case, thus an item or service must be reasonable and necessary based on the factors outlined in the Medicare Program Integrity Manual (MPIM), CMS Pub. 100-08, Ch. 3, § 3.6.2.2. MPIM, Ch. 13, § 13.5.1. Dec. at 3, 5–7. The ALJ determined, based on the "detailed and highly persuasive" testimony of the appellant's expert witness that amniotic membrane wound covering products are essentially "functionally identical." Dec. at 6. The ALJ further determined that there was "no legal or practical requirement that prospective randomized clinical trials or similar studies be conducted for a specific brand of product" and that the appellant had submitted "numerous peer-reviewed evidence-based studies involving amniotic wound covering products". *Id.* Accordingly, the ALJ reasoned that the beneficiary trialing conservative measures without success, the "functionally identical" nature of amniotic wound covering products, and numerous studies submitted by the appellant, entitled the services at issue to Medicare coverage. *Id.* at 6–7.

---

[2] We note the apparent typographical error in the Medicare Administrative Contractor's (MAC's) redetermination decisions, specifically its reference to the beneficiary receiving the XWrap to treat a "pressure sore." *See, e.g.*, File 3 at 374. However, we find this error harmless as the ALJ and CMS both correctly identified the beneficiary's specific medical condition and we thus proceed with our review of whether the ALJ erred in finding that the Xwrap furnished to treat the beneficiary's venous stasis wounds met Medicare coverage criteria. *See* Dec. at 4–7; Exh. MAC-1 at 3.

[3] We note the apparent typographical error in the QIC's reconsideration decision, specifically its reference to a "Impax amniotic membrane (Q4262)." *See* File 2 at 5. However, given the QIC listed the correct item and procedure code earlier in its decision, we find this error harmless and proceed with our review. *See id.* at 4.

Before the Council, CMS contends that the ALJ materially erred by determining that the Xwrap at issue was medically reasonable and necessary, because the ALJ did not properly apply the pertinent Medicare authorities. Exh. MAC-1 at 2, 9–12. Specifically, CMS contends that, although the ALJ acknowledged that the reasonableness and necessary criteria under MPIM Chapters 3 and 13 apply in the absence of NCDs or LCDs, the ALJ did not actually perform an analysis in accordance with the MPIM to determine whether Xwrap is safe and effective, not experimental or investigational, and appropriate, based on sufficient peer-reviewed, evidence-based literature to support the use of the specific product at issue for the type of wound at issue. *Id.* at 11; *see also* MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1–3.6.2.2; MPIM, Ch. 13, §§ 13.5.3, 13.5.4. CMS argues that the ALJ instead erroneously relied on the testimony of the appellant's expert witness in finding that amniotic wound covering products are all "functionally identical" and did not sufficiently analyze whether the medical literature submitted by the appellant supported such an assertion. Exh. MAC-1 at 11. CMS further asserts, generally, that the ALJ did not perform the reasonableness and necessity analysis required by the applicable manual guidance. *Id.* at 9–12. Thus, CMS concludes that the ALJ's decision contains an error of law material to the outcome of the appellant's claim because it resulted in an order for Medicare coverage and payment without a determination that the item was medically reasonable and necessary in accordance with CMS policies. *Id.* at 13. In addition, CMS argues that the ALJ's favorable coverage determination is not supported by the preponderance of the evidence in the record. *Id.* at 3, 12–13. CMS contends that there is no peer-reviewed literature submitted to support a determination of reasonableness and necessity in this case. *Id.* at 12–13.

In response, the appellant contends that the ALJ's decision is supported by the evidence and contains no errors of law. *See* Exh. MAC-2. The primary thrust of the appellant's contentions is as follows:

> The AdQIC's allegation misstates both the burden at the hearing and the evidence presented here. While it was the Appellant's burden to show that the items or services were "reasonable and necessary" as that term is defined, peer-reviewed clinical studies are neither required nor sufficient to meet that burden. Here, the AdQIC over-relies on such clinical studies by demanding that they be produced while ignoring all other types of evidence.

*Id.* at 6. The appellant further explains that the ALJ "accurately identified the key legal issues, most important legal and policy authorities, and relevant facts; performed a detailed analysis of the relevant evidence and issued a coverage determination on the claims at issue". *Id.* at 4.[4] In response to the exception raised by CMS regarding the

---

[4] We acknowledge the appellant's citation to a previous Council decision regarding the standard for granting own motion review. *See* Exh. MAC-2 at 3–4. However, in general Council decisions are not precedential. Any prior determination regarding the decision of whether to grant own motion review has no bearing on whether the Council

ALJ's failure to apply the guidance found in Chapter 13 of the MPIM, the appellant contends that Chapter 13 is inapplicable here because the guidance contained within does not "impose any requirement on the evidence that a provider must submit—or that an ALJ must consider—in determining whether a service that is not governed by any NCD or LCD is reasonable and necessary pursuant to Chapter 3 of the MPIM." *See id.* In the alternative, the appellant contends that even if Chapter 13 were applicable, CMS "selectively quot[ed]" the provided list of examples "of sources of information that may serve as available evidence of general acceptance by the medical community" and explains that the guidance does "not explicitly require" the imputed requirements argued for by CMS. *Id.* at 5. The appellant further asserts that it provided "multiple peer-reviewed evidence-based studies involving amniotic membrane skin substitute products for the treatment of chronic non-healing wounds" and that the ALJ did not err in relying on the testimony provided by its expert witness "as no such requirement exists" that evidence of the functionally identical nature of amniotic membrane products must be in the form of medical literature. *Id.* at 5–6. The appellant concludes by stating that the ALJ's decision was supported by the preponderance of the evidence in the administrative record. *Id.* at 6–8.

Having reviewed the administrative record, we agree with CMS that the ALJ materially erred as a matter of law by not fully reviewing and applying pertinent CMS guidance for determining medical reasonableness and necessity in the absence of an NCD, LCD, or other guidance. *See* Exh. MAC-1; 42 C.F.R. § 405.1110(b)(1).

Relevant here, § 1862(a)(1)(A) of the Act provides that Medicare will only cover items and services that are medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the function of a malformed body member. As the party seeking payment, the appellant has the burden to demonstrate the services for which it seeks coverage are reasonable and necessary for the purposes provided. 42 C.F.R. § 424.5(a)(6).

Absent an applicable NCD, LCD, or policy manual guidance, as is the case here, contractors and adjudicators must make individual reasonable and necessary determinations by assessing whether the service is safe and effective, not experimental or investigational, and appropriate. MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1–3.6.2.2 (Rev. 10365, Effective Aug. 27, 2020). Medicare defines "appropriate" to require, among other things, that the service must be furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member; that it is a service that meets, but does not exceed, the beneficiary's medical need; and that it is furnished in a setting appropriate to the beneficiary's medical needs and condition. *See id.* § 3.6.2.2.

---

is required to grant or deny the request by CMS here. *See id.* §§ 405.1108(a), 405.1128(a). Each claim is considered individually based on the record developed for that individual claim. *See id.*

The MPIM further states that, when developing an LCD, a MAC shall use evidence of "general acceptance by the medical community" including "published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines." MPIM, Ch. 13, § 13.5.3 (Rev. 863, Effective Oct. 3, 2018); *see also id.* § 13.2.3 ("[a]cceptance by individual health care providers, or even a limited group of health care providers, does not indicate general acceptance of the item or service by the medical community."). While we agree with the appellant that these MPIM provisions constitute guidance for contractors assessing medical reasonableness and necessity and in conducting an evidentiary review during an LCD's development, the Council finds that they necessarily apply to adjudicators, including ALJs and the Council, reviewing the contractor's medical reasonableness and necessity determination in the absence of an applicable NCD or LCD. *See* Exh. MAC-2 at 4–5. Thus, while MPIM Ch. 13, does, on its face, provide guidance for contractors in developing LCDs, it is appropriate to consider its examples of acceptable evidence because the development of LCDs fundamentally involves making a determination of medical reasonableness and necessity, as we are asked to do here in the absence of an applicable coverage policy. *See* MPIM, Ch. 13, § 13.5.3.

Importantly, in making coverage determinations, CMS has historically interpreted the terms "reasonable and necessary" to mean that the item or service in question is safe and effective and not experimental, based on "acceptable clinical evidence" and "authoritative evidence." *See* 52 Fed. Reg. 15560 (Apr. 29, 1987); 54 Fed. Reg. 4304 (Jan. 30, 1989). Moreover, in the context of reviewing individual coverage determinations, the regulations specifically contemplate consideration of scientific evidence. *See* 42 C.F.R. § 405.1046(a). Thus, the Medicare policies consider the underlying evidence as an inherent part of evaluating whether an item or service is reasonable and necessary, including whether it is safe, effective, appropriate, and experimental or investigational. We do not find that it would be consistent with Medicare policy for us (nor the ALJ) to find an item or service medically reasonable and necessary in the absence of a coverage policy without considering such evidence or relying only on testimony. Therefore, we find that reliance on Chapter 13 of the MPIM is part of an established framework for assessing medical reasonableness and necessity.

All statutes and regulations pertaining to the Medicare program are binding on ALJs, attorney adjudicators and the Council. 42 C.F.R. § 405.1063(a). And while not bound by the MPIM guidance, the ALJ should have afforded these guidance provisions substantial deference. *Id.* § 405.1062. Therefore, the ALJ erred as a matter of law by not adhering to the regulatory requirements and by not giving substantial deference to the applicable MPIM requirements. *Id.* The ALJ's error was material to the outcome of the claims because it resulted in the ALJ ordering Medicare coverage and payment for services

without full consideration of medical necessity under the relevant MPIM provisions. *Id.* § 405.1110(b)(1).[5]

In this case, despite the absence of an applicable NCD, LCD, or other policy manual guidance addressing the use of Xwrap on the dates of service, we find that the ALJ failed to perform a proper and complete analysis of the reasonable and necessary standards set forth in the MPIM. *See* MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1–3.6.2.2; *see also* MPIM, Ch. 13, §§ 13.5.3, 13.5.4. We acknowledge that the ALJ used the pertinent language from the applicable guidance; however, the ALJ failed to properly determine under the MPIM provisions whether the product was "safe and effective," "not experimental or investigational," and "appropriate" based on "the available evidence of general acceptance by the medical community." MPIM, Ch. 3, § 3.6.2.2; Dec. at 3–7; *see also* MPIM, Ch. 13, § 13.5.3. When evaluating whether the Xwrap was reasonable and necessary, the ALJ relied heavily on the testimony of the appellant's expert witness that all amniotic wound covering products "were functionally identical." Dec. at 5–7. Furthermore, the ALJ asserted that "numerous peer-reviewed evidence-based studies involving amniotic membrane wound covering products, several of which are included in the administrative record, support that use of such products can be beneficial in the treatment of non-healing wounds and ulcers."[6] *Id.* We recognize that the appellant did submit various medical studies in support of its argument for coverage, which are discussed in more detail below. *See* File 13 at 15–23, 25–31, 33–40, 42–49, 51–57, 59–67, 77–116. However, the ALJ failed to provide an individual analysis of any of these studies and did not consider whether this medical literature submitted by the appellant mentioned the specific product at issue or its use for the treatment of the beneficiary's specific wound. *See id.* at 4–7; MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1–3.6.2.2; *see also* MPIM, Ch. 13, § 13.5.3. Thus, the ALJ failed to properly apply the MPIM provisions to determine whether Xwrap was "safe and effective," "not experimental or investigational," and "appropriate" based on "the available evidence of general acceptance by the medical community." MPIM, Ch. 3, § 3.6.2.2; *see also* MPIM, Ch. 13, § 13.5.3.

Having taken own motion review, the Council finds that the evidence in the record does not support that Xwrap was medically reasonable and necessary pursuant to the standards in the MPIM. MPIM, Ch. 3, § 3.6.2.2; *see also* MPIM, Ch. 13, §§ 13.2.3, 13.5.3, 13.5.4. The appellant did not provide sufficient evidence to satisfy the Medicare coverage criteria. Without sufficient evidence, there is no basis for the Council to find that the

---

[5] We note, having found errors of law material to the outcome of the claims, we need not address CMS' additional contention, or the appellant's response, regarding the issue of whether the preponderance of the evidence supports coverage. Exh. MAC-1 at 12–13; Exh. MAC-2 at 6–8.

[6] The ALJ further found that the beneficiary had tried and failed conservative treatment and given the "severe potential morbidity" of the beneficiary's nonhealing wound, the use of Xwrap was therefore reasonable and necessary. *Id.* at 6–7. This finding, however, is insufficient for coverage.

Xwrap membrane was medically reasonable and necessary in accordance with the applicable authorities. *See id.*

Specially, before the ALJ, the appellant relied on the following medical literature:

- Lawrence A. DiDomenico, et al., *Use of an aseptically processed, dehydrated human amnion and chorion membrane improves likelihood and rate of healing in chronic diabetic foot ulcers: A prospective, randomised, multi-centre clinical trial in 80 patients*, 15 INTERNATIONAL WOUND JOURNAL (2018);
- Beverly Douglas, et al., *The Fate of Homologous and Heterologous Chorionic Transplants As Observed By The Transparent Tissue Chamber Technique In The Mouse*, 13 PLASTIC AND RECONSTRUCTIVE SURGERY (1954);
- Alexandra M. Haugh, et al., *Amnion Membrane in Diabetic Foot Wounds: A Meta-analysis*, 5 GLOBAL OPEN (2017);
- Robert D. Galiano, et al., *A Prospective Multicenter Study of a Weekly Application Regimen of Viable Human Amnion Membrane Allograft in the Management of Nonhealing Diabetic Foot Ulcers*, 11 GLOBAL OPEN (2023);
- Paul Glat, et al., *Placental Membrane Provides Improved Healing Efficacy and Lower Cost Versus a Tissue-Engineered Human Skin in the Treatment of Diabetic Foot Ulcerations*, 7 GLOBAL OPEN (2019);
- John A. McIntyre & W. Page Faulk, *Antigens of human trophoblast. Effects of heterologous anti-trophoblast sera on lymphocyte responses in vitro.*, 149 THE JOURNAL OF EXPERIMENTAL MEDICINE (1979);
- Thomas E. Serena, et al., *A Multicenter, Randomized, Controlled, Clinical Trial Evaluating Dehydrated Human Amniotic Membrane in the Treatment of Venous Leg Ulcers*, 150 PLASTIC AND RECONSTRUCTIVE SURGERY (2022);
- Antonietta R. Silini, et al., *The long path of human placenta, and its derivatives, in regenerative medicine*, 3 FRONTIERS IN BIOENGINEERING AND BIOTECHNOLOGY (2015);
- Charles M. Zelen, et al., *A prospective, randomized, controlled, multi-centre comparative effectiveness study of healing using dehydrated human amnion/chorion membrane allograft, bioengineered skin substitute or standard of care for treatment of chronic lower extremity diabetic ulcers*, 12 INTERNATIONAL WOUND JOURNAL (2015);
- Charles M. Zelen, et al., *A prospective, randomised comparative study of weekly versus biweekly application of dehydrated human amnion/chorion membrane allograft in the management of diabetic foot ulcers*, 11 INTERNATIONAL WOUND JOURNAL (2014).

File 13 at 15–23, 25–31, 33–40, 42–49, 51–57, 59–67, 77–116.

Without an applicable NCD or LCD, the MPIM clarifies that reasonableness and necessity depend on whether the treatment is safe and effective, not experimental or investigational, and appropriate. *See* MPIM, Ch. 3, § 3.6.2.2.

In this case, the evidence provided does not demonstrate that Xwrap was safe and effective, not experimental or investigational, and appropriate for treatment of the beneficiary's wounds. Here, the medical records reflect that the beneficiary received the Xwrap to treat venous stasis wounds that had remained in a nonhealing state despite the exhaustion of conservative treatment measures. *See* File 3 at 44. However, of the ten pieces of medical literature listed above, none of them specifically mention Xwrap. File 13 at 15–23, 25–31, 33–40, 42–49, 51–57, 59–67, 77–116. Furthermore, six of the ten pieces submitted concern the use of amniotic wound covers for the treatment of nonhealing diabetic lower extremity ulcers (not venous stasis wounds), two appear to provide historical background of the development of placental membranes, and one seems to be a global overview of placental-derived clinical applications. *See id.* at 15–23, 25–31, 33–40, 42–49, 51–57, 77–116. We find that these 9 studies are insufficient evidentiary support to show that Xwrap was safe and effective to treat the type of wounds at issue during the dates of service here, and not experimental or investigational.

We recognize that the appellant did submit one study that addresses the use of "dehydrated human amniotic membrane[s] in the treatment of venous leg ulcers, *A Multicenter, Randomized, Controlled, Clinical Trial Evaluating Dehydrated Human Amniotic Membrane in the Treatment of Venous Leg Ulcers*, authored by Thomas E. Serena, et al. *See id.* at 59–67. This study evaluated the safety and effectiveness of "dehydrated human amnion and chorion allograft (dHACA)" in the treatment of "chronic venous leg ulcers." *Id.* In reviewing the contents of this study, we credit the appellant's contention that, based upon its expert witness's testimony, the XWrap is functionally identical to the product used in the study. *See* Exh. MAC-2 at 5. Initially, while the study does appear to concern the same or substantially similar condition to that of the beneficiary, we note that the study contains a table of "exclusion criteria" that make any conclusions drawn from it inapplicable here. *See* File 13 at 61. Specifically, the study indicates that patients were initially screened for eligibility in accordance with certain inclusive or exclusive criteria, with "[h]istory of liver disease with active cirrhosis" listed under the header of "[e]xclusion criteria." *See id.* This, based on our understanding, would make any conclusions drawn from the study inapplicable to the beneficiary as the submitted medical records indicate that the beneficiary was being treated, during the dates of service at issue, for "ascites related to liver cirrhosis." *See* File 3 at 44–45.

In addition, we find that the record does not include evidence to support that Xwrap was "appropriate" for the treatment of the beneficiaries' condition, as defined in the MPIM. As discussed above, most of the pieces of medical literature provided do not document, recommend, or provide sufficient support for the use of Xwrap specifically. *See, e.g.*, File 13 at 15–23, 25–31, 33–40, 42–49, 51–57, 59–67, 77–116. We also find no evidence

in the administrative records that Xwrap is an accepted standard of medical practice for treatment of the beneficiary's condition. *See generally* Administrative Record. The record also does not contain clinical guidelines or evidence-based consensus statements recommending the use of Xwrap for wound care. *See* MPIM, Ch. 13, § 13.5.3; *see also generally* Administrative Record.

Moreover, we have considered the testimony of the appellant's expert witness *de novo* but find that it does not overcome the fact that the appellant failed to submit *relevant* evidence, *i.e.*, "published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines" to support its argument. *See* MPIM, Ch. 13, § 13.5.3; *see also id.* § 13.2.3. Ultimately, the burden is on the appellant to submit sufficient information for coverage of the services. Act § 1833(e). Here, as discussed above, the appellant has not submitted any *relevant*, authoritative evidence, such as peer-reviewed journals, studies, and clinical guidelines, to support a finding that the item at issue is safe and effective, not experimental or investigational, and appropriate for the beneficiary's condition. MPIM, Ch. 3, § 3.6.2.2; *see also* MPIM, Ch. 13, §§ 13.5.3–13.5.4. Without such evidence, we simply cannot determine the medical reasonableness and necessity of Xwrap in accordance with the applicable authorities.

Therefore, we find insufficient evidence that Xwrap was "[f]urnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition." MPIM, Ch. 3, § 3.6.2.2. The record does not demonstrate that Xwrap is the standard of care for treatment of the beneficiary's condition, that it meets but does not exceed the beneficiary's medical needs, and that it is at least as beneficial as existing and available medically appropriate alternatives. *See id.* Consequently, the record does not demonstrate that Xwrap was generally accepted by the medical community as "appropriate" for the beneficiary.

Based on the discussion above, and in accordance with the standards set forth in the MPIM, the Council concludes that the appellant has not demonstrated that the Xwrap at issue was medically reasonable and necessary under the applicable manual requirements, which is necessary to support coverage. 42 C.F.R. § 424.5(a)(6). Therefore, Medicare Part B does not cover the Xwrap wound covers at issue.

At the lower levels of review, the contractors found that the appellant was liable for the non-covered costs pursuant to § 1879 of the Act. *See* File 2 at 7; File 3 at 21, 29, 37. The appellant did not previously raise any contentions regarding its liability for the non-covered costs and has not submitted any exceptions on this issue to the Council. *See generally* Record; *see also* Exh. MAC-2. Therefore, the Council summarily affirms the QIC's determination on this issue and finds that the appellant is liable for the non-covered costs. *See* 42 C.F.R. § 405.1112(c).

DECISION

The Council reverses the ALJ's decision. The Council finds that Medicare Part B does not cover the Xwrap furnished to the beneficiary on April 18, April 26, and April 30, 2024. The appellant is liable for the non-covered costs.

**MEDICARE APPEALS COUNCIL**

Kevin L. Flynn
Administrative Appeals Judge

Judith Pichler
Administrative Appeals Judge

Date: March 9, 2026

**DEPARTMENT OF HEALTH & HUMAN SERVICES** Office of the Secretary

Departmental Appeals Board
Room G-644, MS 6127
330 Independence Avenue S.W.
Washington, DC 20201

# Nondiscrimination Notice

The Departmental Appeals Board (DAB) complies with applicable Federal civil rights laws and does not discriminate based on race, color, national origin, age, disability, or sex. The DAB does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex.

The DAB provides free aids and services to people with disabilities to communicate effectively with us, such as:

- Qualified sign language interpreters
- Written information in other formats (large print, audio, accessible electronic formats, other formats)

The DAB also provides free language services to people whose primary language is not English, such as:

- Qualified interpreters
- Information written in other languages

If you need these services, contact the DAB Administration Division at (202) 565-0200 or DABAdministrationDivision@hhs.gov.

If you believe the DAB has failed to provide these services or discriminated in another way on the basis of race, color, national origin, age, disability, or sex, you can file a grievance with the U.S. Department of Health and Human Services, Office for Civil Rights, electronically through the Office for Civil Rights Complaint Portal (https://ocrportal.hhs.gov/ocr/portal/lobby.jsf), or by mail or phone at:

U.S. Department of Health and Human Services
200 Independence Avenue, SW
Room 509F, HHH Building
Washington, D.C. 20201
1-800-368-1019, 800-537-7697 (TDD)

Complaint forms are available at http://www.hhs.gov/ocr/office/file/index.html.

## DAB Language Access Services:

**Español (Spanish)**
ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 1-202-565-0200.

**繁體中文 (Chinese)**

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 1-202-565-0200。

**Tiếng Việt (Vietnamese)**
CHÚ Ý: Nếu bạn nói Tiếng Việt, có các dịch vụ hỗ trợ ngôn ngữ miễn phí dành cho bạn. Gọi số 1-202-565-0200.

**한국어 (Korean)**

주의: 한국어를 사용하시는 경우, 언어 지원 서비스를 무료로 이용하실 수 있습니다. 1-202-565-0200 번으로 전화해 주십시오.

**Tagalog (Tagalog – Filipino)**

PAUNAWA: Kung nagsasalita ka ng Tagalog, maaari kang gumamit ng mga serbisyo ng tulong sa wika nang walang bayad. Tumawag sa 1-202-565-0200.

**Русский (Russian)**

ВНИМАНИЕ: Если вы говорите на русском языке, то вам доступны бесплатные услуги перевода. Звоните 1-202-565-0200.

**العربية (Arabic)**

ملحوظة: إذا كنت تتحدث اذكر اللغة، فإن خدمات المساعدة اللغوية تتوافر لك بالمجان. اتصل برقم 1-202-565-0200 (رقم هاتف الصم والبكم: .)

**Kreyòl Ayisyen (French Creole)**

ATANSYON: Si w pale Kreyòl Ayisyen, gen sèvis èd pou lang ki disponib gratis pou ou. Rele 1-202-565-0200.

**Français (French)**

ATTENTION : Si vous parlez français, des services d'aide linguistique vous sont proposés gratuitement. Appelez le 1-202-565-0200.

**Polski (Polish)**

UWAGA: Jeżeli mówisz po polsku, możesz skorzystać z bezpłatnej pomocy językowej. Zadzwoń pod numer 1-202-565-0200.

**Português (Portuguese)**

ATENÇÃO: Se fala português, encontram-se disponíveis serviços linguísticos, grátis. Ligue para 1-202-565-0200.

**Italiano (Italian)**

ATTENZIONE: In caso la lingua parlata sia l'italiano, sono disponibili servizi di assistenza linguistica gratuiti. Chiamare il numero 1-202-565-0200.

**Deutsch (German)**

ACHTUNG: Wenn Sie Deutsch sprechen, stehen Ihnen kostenlos sprachliche Hilfsdienstleistungen zur Verfügung. Rufnummer: 1-202-565-0200.

**日本語 (Japanese)**

注意事項：日本語を話される場合、無料の言語支援をご利用いただけます。1-202-565-0200 まで、お電話にてご連絡ください。

**فارسی (Farsi)**

**توجه:** اگر به زبان فارسی گفتگو می کنید، تسهیلات زبانی بصورت رایگان برای شما فراهم می باشد. با 1-202-565-0200 تماس بگیرید.

Jennifer L. Colagiovanni
Wachler & Associates, P.C.
210 E. 3rd St., Suite 204
Royal Oak, MI 48067